UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

UNITED STATES OF AMERICA    )
                                   )
           v.                   )      2:24-cr-000126-JAW-1
                                   )
IAN RENAUD                  )

**ORDER ON MOTION TO DISMISS**

A defendant charged with possession of a firearm by a prohibited person pursuant to 18 U.S.C. § 922(g)(9) moves to dismiss his indictment on the ground that the statute is unconstitutional as applied to him by violating his Second Amendment right to bear arms.

Objecting on the ground of relevance, the defendant protests the court's consideration of extrinsic evidence attached to the federal government's response to his motion to dismiss. The court overrules the objection, concluding as-applied challenges require reliance on a factual record and the submitted exhibits are relevant to consequential facts.

On the motion to dismiss, the Court of Appeals for the First Circuit, the circuit court to which this district court bears allegiance, has authoritatively ruled that § 922(g)(9) is constitutional, and the court is bound under the doctrine of stare decisis to apply its teaching. In excess of caution, as this area of law is in flux, the court examined the issue to determine whether First Circuit precedent has been cast into disrepute by supervening authority. Based on its analysis of intervening caselaw and the history and tradition of gun regulation in this country, the court concludes that

the law supports restrictions on gun ownership for those who pose a threat to the safety of others and that the government has established a present threat posed by the defendant. The court denies the defendant's motion.

## I.    BACKGROUND

On October 15, 2024, the United States (the Government) filed a criminal complaint in this Court against Ian Renaud, alleging Mr. Renaud knowingly possessed multiple firearms despite a prior conviction of misdemeanor domestic violence in violation of 18 U.S.C. § 922(g)(9). *Crim. Compl.* (ECF No. 1). Mr. Renaud was arrested that same day. *Min. Entry* (ECF No. 5). On November 6, 2024, a federal grand jury charged Mr. Renaud in a one-count indictment as being a felon in possession of a firearm in violation of § 922(g)(9). *Indictment* (ECF No. 15).

On December 16, 2024, Mr. Renaud moved the Court to dismiss the indictment, asserting § 922(g)(9) as applied to him violates the Second Amendment to the United States Constitution. *Mot. to Dismiss* (ECF No. 33) (*Def.'s Mot.*). The Government responded in opposition on February 12, 2025. *Gov't Resp. in Opp'n to Def.'s Mot. to Dismiss* (ECF No. 44) (*Gov't Opp'n*). On March 12, 2025, Mr. Renaud replied. *Def.'s Reply to Gov't Opp'n to Def.'s Mot. to Dismiss* (ECF No. 47) (*Def.'s Reply*).

On March 25, 2025, the Court held a telephone conference with counsel, during which it discussed the admissibility, at the motion to dismiss stage, of extrinsic evidence attached to the Government's opposition; the Court ordered Defendant's counsel to submit a written position on the extrinsic evidence by April 1, 2025, and the Government to respond within a week thereafter. *Min. Entry* (ECF No. 50). On

April 1, 2025, the Defendant objected to five of the six pieces of extrinsic evidence submitted by the Government based on Federal Rule of Criminal Procedure 12 and on relevancy grounds. *Def.'s Obj. to Attached Exs. To Gov't's Resp. in Opp'n to Def.'s Mot. to Dismiss* (ECF No. 51) (*Def.'s Evid. Obj.*). After requesting and being granted an extension, *Unopposed Mot. for Extension of Time to File Reply to Mot. to Dismiss* (ECF No. 52); *Order* (ECF No. 53), the Government responded on April 15, 2025, asserting it should be permitted to make a factual record in response to the Defendant's motion to dismiss. *Gov't's Resp. to Def.'s Obj. to Attached Exs. to Gov't's Resp. in Opp'n to Def.'s Mot. to Dismiss* (ECF No. 55) (*Gov't's Evid. Resp.*).

## II. THE SCOPE OF THE RECORD

### A. The Parties' Positions

#### 1. Ian Renaud's Objection

Mr. Renaud objects to the Court's consideration of the following exhibits attached to the Government's opposition: "Gov't Exh. 1: Kittery PD Arrest Report"; "Gov't Exh. 3: Kittery PD Arrest Report"; "Gov't Exh. 4: Criminal History"; "Gov't Exh. 5: Kittery PD Arrest Report"; and "Gov't Exh. 6: MA Criminal Complaint." *Def.'s Evid. Obj.* at 1. He does not, however, object to the Court's consideration of the second exhibit to the Government's opposition: "*State of Maine v. Ian Renaud*, Docket No. YRKCD-CR-2018-40839." *Id.*

In support, Mr. Renaud contends the Court's reliance on exhibits contravenes Federal Rule of Criminal Procedure 12 and argues, further, "information pertaining to past charged or dismissed conduct, prior non-disqualifying convictions, and the specific facts underlying Mr. Renaud's conviction for a misdemeanor crime of

domestic violence" are irrelevant to his current charge. *Id.* at 2. Mr. Renaud continues that "the only factors relevant" for the purposes of the pending motion to dismiss "are the elements of the statute of conviction, the fact of Mr. Renaud's conviction for a misdemeanor crime of domestic violence, and date and duration of his sentence." *Id.* (citing *United States v. Giglio*, 126 F.4th 1039, 1046 (5th Cir. 2025) (in turn citing *United States v. Diaz*, 116 F. 4th 458, 467 (5th Cir. 2024))).

## 2.    The Government's Response

The Government responds that it should be permitted to develop a factual record in response to the Defendant's as-applied challenge. *Gov't Evid. Resp.* at 1. Under First Circuit caselaw, the Government argues, as-applied challenges "necessarily require[] a concrete and developed factual record for the court to consider." *Id.* at 2 (quoting *United States v. Andujar-Arias*, 507 F.3d 734, 747 (1st Cir. 2007), *abrogated on other grounds by United States v. Rodriguez*, 527 F.3d 221 (1st Cir. 2008) (citation amended)). Here, the Government submits, "Defendant's argument hinges on the factual question of whether he posed a credible threat of physical violence to others at the time of the charged offense," and the Court should allow the Government to rebut Mr. Renaud's factual assertions with evidence of the danger he poses. *Id.* at 3.

The Government contends Mr. Renaud presented two factual bases for his position that he posed no threat at the time of the charged offense: "(1) Defendant completed a certified batterers intervention program and state probation program in 2021; (2) there is no evidence that Defendant posed a credible threat of violence to the physical safety of another at the time of the offense set forth in the present

4

Indictment." *Id.* at 4 (citing *Def.'s Mot.* at 7). The Government submits its attached exhibits "show Defendant's history of domestic violence, the facts underlying the predicate offense, and are relevant to determining the danger he posed at the time of the charged offense." *Id.*

The Government continues to dispute Mr. Renaud's characterization of Fifth Circuit caselaw, pointing out that in *United States v. Giglio*, 126 F.4th 1039, the Fifth Circuit only stated it "need not look beyond" the predicate conviction to affirm the constitutionality of the restriction on firearms in that case. *Id.* at 4-5 (quoting *Giglio*, 126 F.4th at 1046). Furthermore, the Government avers, in *United States v. Diaz*, 116 F.4th 458, the Fifth Circuit "did not clearly hold that courts are *always* forbidden from considering evidence beyond the predicate convictions in analyzing as applied challenges," *id.* at 6 (quoting *Diaz*, 116 F.4th at 467) (the Government's emphasis), but was "simply setting forth what convictions could be considered 'predicate convictions'" in the context of analyzing the tradition of disarmament based on criminal history. *Id.* at 5-6 (quoting *Diaz*, 116 F.4th at 467). The Government further distinguishes *Diaz* as being argued as a post-conviction appeal, and thus inapposite to the "extraordinary step" of dismissing an indictment. *Id.* at 6 (citing, e.g., *United States v. Barnard*, 704 F. Supp. 3d 259, 265 (D. Me. 2023); *Whitehouse v. United States Dist. Ct.*, 53 F.3d 1349, 1360 (1st Cir. 1995)).

At bottom, the Government argues the Court is empowered to consider extrinsic evidence on a motion to dismiss and, further, that Mr. Renaud's as-applied challenge necessitates examination of a fully developed factual record. *Id.* at 6-8.

### B.    Legal Standard for Consideration of Evidence on Motion to Dismiss Criminal Complaint

Federal Rule of Criminal Procedure 12 provides: "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." FED. R. CRIM. P. 12(b)(1).

Reviewing an as-applied challenge, the First Circuit has held that "plaintiffs remain free to challenge the [statute], as applied, in a concrete factual setting." *McGuire v. Reilly*, 260 F.3d 36, 47-48 (1st Cir. 2001).  In the criminal context, the First Circuit has further held that a party "must provide a factual basis for its argument" and that "[t]his obligation is most significant when the party has raised an as-applied challenge, which necessarily requires a concrete and developed factual record for the court to consider." *Andujar-Arias*, 507 F.3d at 747 (collecting cases).

### C.    Discussion

The Government attached six exhibits to its response to Mr. Renaud's motion to dismiss; Mr. Renaud objected to five of them:

1) Government's Exhibit 1 is an eight-page police report from the Kittery Police Department from an incident on August 24, 2018, which led to Mr. Renaud's domestic violence misdemeanor conviction.  That misdemeanor conviction is the predicate conviction underlying the current federal charge.

2) Government's Exhibit 2 (to which Mr. Renaud does not object) is the state domestic violence complaint dated September 11, 2018, charging Mr. Renaud with domestic violence assault, Class D, arising out of an incident occurring on August 24, 2018, and the docket entries confirming that Mr.

6

Renaud pleaded guilty to the domestic violence charge on May 20, 2019 and received a sentence of 364 days of incarceration and two years of probation. The docket also confirms that one of the conditions of Mr. Renaud's probation was that he not own or possess a firearm or dangerous weapon. Government's Exhibit 2 also confirms that Mr. Renaud violated the conditions of his probation and that his probation was revoked on July 9, 2019, leading to a revocation sentence on August 21, 2019 of eight days in jail and continued probation with the firearms prohibition. Government's Exhibit 2 further demonstrates that Mr. Renaud again violated the conditions of his probation, and the state of Maine moved to revoke his probation on November 6, 2019. On January 14, 2020, Mr. Renaud admitted this second violation, and he was ordered to serve three months of incarceration with ongoing probation to continue, including the weapons prohibition.

3) Government's Exhibit 3 is an arrest report from the Kittery Police Department dated May 11, 2014, modified on May 14, 2014, and approved May 16, 2014, involving another domestic violence incident relating to Mr. Renaud.

4) Government's Exhibit 4 is Mr. Renaud's criminal history printed on September 24, 2024, setting forth his prior convictions from an operating under the influence charge dated July 5, 2008 through a violation of protective order charge dated November 3, 2019. It also contains other

activity between Mr. Renaud and the Kittery Police Department not resulting in convictions.

5) Government's Exhibit 5 is a nine-page police report from the Kittery Police Department dated November 4, 2019, modified that same day, and approved on November 5, 2019, discussing an incident on November 3, 2019 which led to charges for violation of a protective order and operating under the influence. Government's Exhibit 4 confirms that Mr. Renaud was charged with these crimes, and, on June 29, 2020, was found guilty of them. It also establishes that he was sentenced to 100 days in jail for the violation of protective order and ninety-six hours for the operating under the influence charge.

6) Government's Exhibit 6 is a criminal complaint dated November 24, 2003 from Fall River, Massachusetts, arising out of an incident of November 23, 2003 in which Fall River police responded to the possible violation of a protective order involving Mr. Renaud. The narrative asserts that Mr. Renaud threatened to harm two individuals and that he was charged with two counts of threat to commit a crime and one count of the violation of an abuse prevention order.

Significantly, Mr. Renaud has not challenged five of these six exhibits on any ground other than relevance. There is a body of First Circuit law that limits a district court's consideration of "arrests, police reports, and warrants despite the fact that no conviction had resulted." *United States v. Mendes*, 107 F.4th 22, 31 (1st Cir. 2024)

(citing *United States v. Marrero-Pérez*, 914 F.3d 20, 22 (1st Cir. 2019)).  Here, the police reports in Government Exhibits 1 and 5 are police reports of incidents that, respectively, later led to Mr. Renaud's convictions.  For these exhibits, therefore, the police reports are "buttressed by convictions" and therefore are properly considered by this Court under *Marrero-Pérez*.[1]  *United States v. Ayala-Landor*, 994 F.3d 73, 76 (1st Cir. 2021) ("Here, the sentencing judge considered a conviction, not a bare arrest record — the *Marrero* line of cases is inapposite").

Government Exhibit 4, Mr. Renaud's criminal history, appears to be what it purports to be, and Mr. Renaud has not challenged the exhibit on authenticity or accuracy grounds.  Even so, in accordance with the First Circuit's directive, the Court considers Government Exhibit 4 only for its recitation of prior convictions and does not consider its list of arrests that have not led to convictions.  *Mendes*, 107 F.4th at 31 (noting that a sentencing court commits error when considering arrests even though no conviction had resulted).

Government Exhibits 3 and 6 are reports of police investigations involving, respectively, potential violations of a protective order in Massachusetts in 2003 and a domestic violence issue in Maine in 2014.  There is no evidence that these incidents resulted in criminal charges or convictions.  Nevertheless, despite *Marrero-Pérez*, the Court has considered the contents of those police reports to determine whether §

---

[1]    That the police report formed the basis of a later conviction does not mean that everything in the report, even matters unrelated to the conviction, is properly considered by a court.  *Marrero-Pérez*, 914 F.3d at 24 (a court may not rely on an arrest report, "without some greater indicia of reliability that the conduct underlying the arrest took place") (emphasis supplied by the Court).  Here, however, the police reports contain information consistent with Mr. Renaud's later convictions and, to the extent they contain extraneous information, the Court has not considered it.

922(g)(9) is constitutional as applied to him.  This conclusion is based on the Court's understanding of the way Rule 12 works.  Rule 12 provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the general issue."  FED. R. CRIM. P. 12(b)(1); *see United States v. Bulger*, 816 F.3d 137, 147 (1st Cir. 2016).  Here, whether Mr. Renaud posed an ongoing threat to the safety of others justifying prosecution for his possession of a firearm is not something the jury would consider if the case went to trial.  To prove a defendant charged under 18 U.S.C. § 922(g) is guilty as charged, the Government must prove beyond a reasonable doubt that the defendant knew that he possessed a firearm and that he belonged to the relevant category of persons barred from possessing a firearm.  *United States v. Minor*, No. 2:17-cr-00021-JDL-1, 2024 U.S. Dist. LEXIS 40665, at *2-3 (D. Me. Mar. 8, 2024).

A trial court may consider and resolve fact questions when ruling on pretrial motions so long as the facts are not matters that must constitutionally be decided by a jury.  1A CHARLES ALAN WRIGHT & ANDREW D. LEIPOLD, FEDERAL PRACTICE AND PROCEDURE, § 195 (2020 ed.) (WRIGHT & LEIPOLD); *Bulger*, 816 F.3d at 147.  Here, if Mr. Renaud wished to challenge the authenticity and accuracy of Government Exhibits 3 and 6, he could have done so, and the Court would have held a hearing and put the Government to its proof.  WRIGHT & LEIPOLD, § 195 ("[A] court in its discretion may conduct a hearing before making its ruling").  However, a defendant has the right to pick his fights and not to contest the accuracy of proffered exhibits to focus on those matters he deems significant and controverted.

10

Here, as earlier noted, Mr. Renaud bases his objection to the Government's attached exhibits "pursuant to Rule 12" and "on the basis of relevancy." *Def.'s Evid. Obj.* at 2. The Government counters this position by noting Mr. Renaud brings an as-applied challenge, specifically arguing he poses no ongoing threat to the safety of others, and as such the Court requires a factual record to evaluate the merits of his position. *Gov't's Evid. Resp.* at 3-4. Taking each of the Defendant's grounds for exclusion in turn, the Court concludes Mr. Renaud has failed to establish a basis for the Court to decline to consider the Government's exhibits.

First, Mr. Renaud "objects to the Court's reliance on the above attached exhibits pursuant to Rule 12." *Def.'s Evid. Obj.* at 2. However, he offers neither a subpart of Rule 12 nor any caselaw, from this Circuit or others, supporting his claim that a court may not consider extrinsic evidence on a motion brought pursuant to Rule 12. In contrast, the Government directs the Court to unequivocal caselaw from the First Circuit holding that, in deciding an as-applied challenge, a court must necessarily rely on a "concrete and developed factual record." *Andujar-Arias*, 507 F.3d at 747. In light of this clear directive, and without being given any basis to conclude otherwise, the Court concludes it is not prohibited from considering extrinsic evidence in resolving an as-applied challenge brought pursuant to Rule 12.

Second, Mr. Renaud objects to five of the six exhibits submitted by the Government on relevancy grounds. Pursuant to Federal Rule of Evidence 401, "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in

11

determining the action." FED. R. EVID. 401. The Government contends that Mr. Renaud's motion to dismiss argues, in essence, that § 922(g)(9) is unconstitutional as applied to himself because he "no longer posed a credible threat of violence to the physical safety of another at the time of the offense set forth in the present Indictment." *Gov't's Evid. Resp.* at 4. Notably, as in *Burger*, 'it was [the Defendant] who put the issue into play" by raising this defense at the pretrial stage. *See Burger*, 816 F.3d at 147.

The Court concludes the Government's proffered evidence of police reports, criminal history, and a state criminal complaint are relevant within the meaning of Rule 401. Based on Mr. Renaud's asserted defense, the fact in dispute is whether he posed a credible threat to the safety of another person at the time of the offense charged. Evidence of his conduct in his domestic relationships, as contained in the Government's exhibits, tends to make this fact more probable.

The Court concludes the Government's exhibits, as attached to its opposition to Mr. Renaud's motion to dismiss, are relevant and admissible, and thus overrules Mr. Renaud's objection to considering such evidence.

## III.    THE MOTION TO DISMISS

### A.    The Parties' Positions

#### 1.    Ian Renaud's Motion to Dismiss

Mr. Renaud quotes the Second Amendment to the United States Constitution as protecting "the right of the people to keep and bear Arms," *Def.'s Mot.* at 2 (quoting U.S. CONST. amend II), and explains that in *District of Columbia v. Heller*, 554 U.S.

570 (2008), the United States Supreme Court ruled that this right is guaranteed to all citizens regardless of militia service. *Id.* (citing *Heller*, 554 U.S. at 592). In subsequent cases, Mr. Renaud says, the Supreme Court clarified that the right to bear arms is not unqualified, *id.* (citing *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010)), and outlined a framework for determining the lawful bounds of restrictions on gun ownership in *New York State Rifle & Pistol Association v. Bruen*, 587 U.S. 1 (2022). *Id.* (citing *Bruen*, 587 U.S. at 17 (citation amended)). In *Bruen*, Mr. Renaud submits, the Supreme Court did away with the former "means-end scrutiny" applied to challenges to gun regulation and implemented a standard under which the government must demonstrate the restriction on gun ownership "is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2-3 (quoting *Bruen*, 597 U.S. at 17). He notes the Supreme Court explained in *Bruen* that the historical tradition test "is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.* at 3 (quoting *Bruen*, 587 U.S. at 37).

Applying this standard to his case, Mr. Renaud argues the Second Amendment protects his right to possess a firearm and there is no historical tradition of permanently dispossessing individuals convicted of misdemeanor domestic violence offenses of firearms. *Id.* Accordingly, Mr. Renaud maintains that his indictment must be dismissed as unconstitutional. *Id.* Elaborating on his arguments, Mr. Renaud first submits that the text of the Second Amendment plainly covers the possession of a firearm, the same conduct that § 922(g)(9) criminalizes. *Id.* He continues that he is one of "the people" presumptively protected by the Second

Amendment, despite his misdemeanor conviction. *Id.* at 4 (citing, inter alia, *Heller*, 554 U.S. at 581; *Bruen*, 597 U.S. at 23-24 (citation amended); *United States v. Rahimi*, 602 U.S. 680, 701 (2024) (citation amended)).

Next, Mr. Renaud proffers that § 922(g)(9), as applied to him, is inconsistent with the historical tradition of domestic firearm regulation. *Id.* He emphasizes the Government bears the burden of showing the statute "is consistent with the Nation's historical tradition of firearm regulation," *id.* at 5 (citing *Bruen*, 597 U.S. at 17), and argues the Government cannot meet its burden in his case. *Id.* Mr. Renaud directs the Court to *United States v. Rahimi*, 602 U.S. 680, as an informative application of the historical tradition test, and submits "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* (quoting *Rahimi*, 602 U.S. at 692 (citation amended)). Conceding the Supreme Court recognized the law is not "trapped in amber," *id.* (quoting *Rahimi*, 602 U.S. at 691 (citation amended)), Mr. Renaud contends "the inquiry turns upon 'how' and 'why' historical regulations burdened the Second Amendment right." *Id.* (citing *Bruen*, 597 U.S. at 28-29 (citation amended)).

Mr. Renaud distinguishes his case from *Rahimi* on the basis that *Rahimi* dealt with a challenge to § 922(g)(8), which prohibits possession of firearms by individuals currently subject to domestic violence restraining orders, and the Supreme Court identified a historical principle of disarming individuals who pose a clear threat of physical violence to another on a temporary basis. *Id.* at 5-6 (citing *Rahimi*, 602 U.S. at 698 (citation amended)). He argues "the scope of § 922(g)(9) substantially exceeds

14

that principle" by permanently banning possession of firearms by domestic-violence misdemeanants "even if any credible threat of physical violence has long since passed." *Id.* at 6. Mr. Renaud thus characterizes § 922(g)(9) as a "lifetime ban for anyone convicted at any time of a misdemeanor crime of domestic violence." *Id.* at 7 (citing *United States v. McGinnis*, 956 F.3d 747, 758 n.6 (5th Cir. 2020)).

Mr. Renaud avers he "successfully completed a certified batterers intervention program and state probation in September 2021" and "has had no further contact with the justice system since that time." *Id.* (citing *Pretrial Servs. Rep. – 1st Add. 12/03/2024* (ECF No. 24)). Thus, he insists, "[a]t the time of the current offense, there is no evidence that [he] posed a credible threat of violence to the physical safety of another." *Id.* Mr. Renaud argues that, without such a showing, there is no historical tradition of prohibiting firearm possession, such that § 922(g)(9) is unconstitutional as applied to him and his indictment must be dismissed. *Id.* at 7-8.

### 2. The Government's Response

The Government opposes Mr. Renaud's motion to dismiss, first recounting the factual basis for Mr. Renaud's misdemeanor conviction of domestic violence for "shov[ing] [his wife] repeatedly in the chest with both hands, causing her to go backwards and hit the kitchen counter" on August 24, 2018. *Gov't's Opp'n* at 1-2 (citing *id.*, Attach 1., *Arrest Rep.* (*Gov't's Ex. 1*); *id.*, Attach 2., *Compl.* (*Gov't's Ex. 2*)). The Government also points out Mr. Renaud's 2014 conviction for domestic violence criminal threatening and criminal restraint, *id.* at 2 (citing *id.*, Attach. 3, *Arrest Rep.* (*Gov't's Ex. 3*); *id.*, Attach. 4, *Crim. Hist. Rep.* (*Gov't's Ex. 4*)), and 2019 conviction for

15

violating the protective order imposed as a result of his misdemeanor domestic violence conviction. *Id.* (citing *id.*, Attach. 5, *Arrest Rep.* (*Gov't Ex. 5.*); *Gov't Ex. 4* at 1). The Government reports that the factual events leading to the criminal restraint conviction occurred on May 10, 2014, when Mr. Renaud "trapped [K.R.] in their bedroom and held a mallet with spikes over her head," causing her to "th[ink] he was going to strike and kill her with the mallet, but he brought it down on the dresser next to her." *Id.* (citing *Gov't Ex. 3*). Further, the Government says Mr. Renaud has a history of violating protective orders imposed as a consequence of such instances of domestic violence. *Id.* at 2-3 (citing *Gov't Ex. 3*).

Turning to the legislative context of § 922(g)(9), the Government explains Congress promulgated the statute because it "recognized a problem of significant national concern in the combination of domestic violence and guns, and saw the existing law as insufficiently protective of its victims." *Id.* at 4-5 (citing *United States v. Booker*, 644 F.3d 12, 15 (1st Cir. 2011) (in turn citing 142 CONG. REC. S8831 (daily ed. July 25, 1996) (statement of Sen. Lautenberg) (*Lautenberg Statement*)). While prior federal laws only prohibited possession of firearms by convicted felons, *id.* at 5 (citing *Booker*, 644 F.3d at 15 (in turn citing *United States v. Hartsock*, 347 F.3d 1, 5 (1st Cir. 2003))), Congress identified a gap in the law for domestic abusers convicted of lesser crimes due to plea bargaining, outdated laws, and lack of cooperation by victims, and thus enacted § 922(g)(9) to "close this dangerous loophole." *Id.* (citing *Booker*, 644 F. 3d at 16 (in turn citing 142 CONG. REC. S10379 (daily ed. Sept. 12, 1996) (statement of Sen. Feinstein) (*Feinstein Statement*); *Lautenberg Statement*)).

The Government argues these reasons remain persuasive today, pointing out that "[t]he presence of a gun in a household with a domestic abuser increases the risk of homicide fivefold" and "domestic assaults with guns are around 12 times likelier to cause death than assaults without guns." *Id.* at 5-6 (citing Aaron J. Kivisto & Megan Porter, *Firearm Use Increases Risk of Multiple Victims in Domestic Homicides*, 48 J. AM. ACAD. PSYCHIATRY L. 26, 26 (2020); Anthony A. Braga et al., *Firearm Instrumentality: Do Guns Make Violent Situations More Lethal?*, 2021 ANN. REV. CRIMINOLOGY 147, 153 (2021)).

The Government avers that, for a misdemeanor crime of domestic violence to qualify as a predicate conviction under § 922(g)(9), the statute requires the defendant to have been "represented by counsel in the case or knowingly and intelligently waived the right to counsel," and, if there was a right to jury trial on the crime charged, the conviction must have resulted from a jury trial unless the person knowingly and intelligently waived that right. *Id.* at 6 (citing 18 U.S.C. § 921(a)(33)(B)(i)(I-II)). Further, if a defendant has a single domestic violence misdemeanor conviction, "the prohibition on firearm possession lasts 5 years from the later of the judgment of conviction or the completion of the sentence," though this restoration of rights is not available if the person was a spouse, parent, or guardian of the victim or shares a child with the victim. *Id.* (citing 18 U.S.C. § 921(a)(33)(C)). However, rights of firearm possession may be restored for such persons if the conviction is expunged or set aside, or if the person has been pardoned. *Id.* (citing 18 U.S.C. § 921(a)(33)(C)).

17

After reviewing recent Supreme Court jurisprudence on Second Amendment claims, *id.* at 7-9, the Government avers only one federal circuit court has considered § 922(g)(9) under the framework prescribed by the Supreme Court in *Bruen*. *Id.* at 10 (citing *United States v. Gailes*, 118 F.4th 822 (6th Cir. 2024)). In *Gailes*, the Government says, the Sixth Circuit upheld the constitutionality of the statute based on its conclusion that "people who were previously convicted of a domestic-violence misdemeanor fall squarely within the category of people who pose a clear threat to the physical safety of others." *Id.* (quoting *Gailes*, 118 F.4th at 830 (in turn citing *Rahimi*, 602 U.S. at 697-99 (citation amended))). The Government also collects post-*Rahimi* decisions from federal district courts which have upheld the constitutionality of § 922(g)(9). *Id.* at 11-12 (citing *United States v. Denis*, No. 6:24-CR-03099-BCW-1, 2025 U.S. Dist. LEXIS 16289 (W.D. Mo. Jan. 28, 2025) (citation amended); *United States v. Kaiser*, No. 1:22-CR-647, 2024 U.S. Dist. LEXIS 174017 (N.D. Ohio Sept. 26, 2024) (citation amended); *United States v. Navarro*, No. 5:22-cr-00063-JWH, 2024 U.S. Dist. LEXIS 122174 (C.D. Cal. July 11, 2024) (citation amended)).

The Government further directs the Court to the First Circuit's pre-*Rahimi* analysis of § 922(g)(9) in *United States v. Booker*, 644 F.3d 12, which the Government asserts remains instructive despite the intervening *Bruen* decision. *Id.* at 12. In *Booker*, the First Circuit noted that § 922(g)(9) covers "only those with a record of violent crime, which is arguably more consistent with the historical regulation of firearms than § 922(g)(1), which extends to violent and nonviolent offenders alike." *Id.* (quoting *Booker*, 644 F.3d at 24-25). The Government also observes that this

District has previously considered the constitutionality of § 922(g)(9) post-*Bruen* but pre-*Rahimi*, holding in 2024 that "our Nation has a historical tradition of restricting persons considered to be untrustworthy or dangerous, including persons convicted of violent offenses, such as an assault, from possessing firearms—a tradition analogous enough with the 'how' and 'why' of the firearms restriction in section 922(g)(9) for it to pass constitutional muster." *Id.* at 12-13 (citing *Minor*, 2024 U.S. Dist. LEXIS 40665, at *9-10).

The Government next contends that there is a longstanding domestic tradition of disarming those who present a physical threat to others or a particular danger of misusing firearms, which is a sufficient analogue to support the constitutionality of § 922(g)(9). *Id.* at 13. In support, the Government marshals a myriad of historic examples of restrictions on firearm possession for persons perceived as dangerous or a threat to the peace spanning from pre-Revolution English law, American colonial history, the Constitution's drafting and the accompanying state ratifying conventions, antebellum developments, and Reconstruction. *Id.* at 14-23. As the Supreme Court did in *Rahimi*, the Government emphasizes historic surety and "going armed" laws as "designed to protect those who faced a threat of harm." *Id.* at 17, 23-24 (citing *Rahimi*, 602 U.S. at 681-82). Based on this evidence, the Government submits, § 922(g)(9) "fits comfortably within the Nation's tradition of disarming those who present a threat to others, or who present a special danger of misuse." *Id.* at 23.

The Government avers that, in *Rahimi*, the Supreme Court upheld § 922(g)(8)(C)(i) as sufficiently similar to historic firearm regulations and urges the

Court to draw a comparison to § 922(g)(9)'s restriction as "restrict[ing] gun possession and use to mitigate 'demonstrated threats' of physical violence to a family or household member." *Id.* at 23-24 (citing *Rahimi*, 602 U.S. at 682). Both statutes, the Government says, require "robust determinations of whether the defendant likely would threaten or had threatened another person." *Id.* at 24. The restriction under § 922(g)(8) would include, for example, a restraining order issued under 19-A M.R.S. § 4109(1), which requires a plaintiff to "prove the allegation or conduct . . . by a preponderance of the evidence. *Id.*

The Government juxtaposes this with § 922(g)(9), which requires a conviction where the misdemeanant "'was represented by counsel in the case, or knowingly and intelligently waived the right to counsel,' and, if entitled to a jury trial, was either found guilty by a jury or knowingly and intelligently waived the right to a jury trial." *Id.* at 24-25 (quoting 18 U.S.C. § 922(g)(9)). The Government contends the constitutional basis of § 922(g)(9) surpasses that of § 922(g)(8) because a domestic violence conviction provides stronger evidence of a credible threat to another than the "court order" contemplated by § 922(g)(8). *Id.* at 25 (citing *Kaiser*, 2024 U.S. Dist. LEXIS 174017, at *9; *Navarro,* 2024 U.S. Dist. LEXIS 122174, at *13). Further, to count as a predicate for § 922(g)(9), the prior misdemeanor conviction must include "as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon," which, the Government says, reflects Congress's inference that the misdemeanant poses a danger to others. *Id.* (citing 18 U.S.C. § 921(a)(33)(A)(ii)).

20

In a footnote, the Government also points out that the First Circuit expressed its doubts as to the propriety of an as-applied Second Amendment challenge in *United States v. Booker*, 644 F.3d 12, noting that the Supreme Court wrote in *Heller* that "statutory prohibitions on the possession of weapons by some persons are proper. That is, the Second Amendment permits categorical regulation of gun possession by classes of persons—e.g., felons and the mentally ill . . .—rather than requiring that restrictions on the right be imposed only on an individualized, case-by-case basis." *Id.* at 24 n.22 (quoting *Booker*, 644 F.3d at 23 (internal citations and quotation marks omitted); *see also United States v. Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011) (holding a fact-specific approach to Second Amendment challenges "would obviously present serious problems of administration, consistency and fair warning")).

Returning to Mr. Renaud's case, the Government characterizes the Defendant's as-applied challenge as predicated on his position that "he has had no contact with the criminal justice system since September 2021 (when he completed a certified batterers intervention program), and therefore he no longer poses a threat of violence." *Id.* at 25 (quoting *Def.'s Mot.* at 6-7). The Government responds, first, "his prior domestic violence conviction is recent and thus he remains an active threat to the physical safety of others," and, second, the historical tradition of laws in the United States has "historically permitted disarmament on evidence that there is reasonable cause to fear a person will breach the peace." *Id.* at 26.

On the first point, the Government analogizes again to § 922(g)(8), averring a restraining order under that section requires a judicial finding that the person

"represents a credible threat to the physical safety of such intimate partner or child," *id.* (quoting 18 U.S.C. § 922(g)(8) (the Government's emphasis)), while § 922(g)(9) similarly reflects "the legislature's reasoned assessment that a person convicted by a court of a misdemeanor crime of domestic violence . . . poses enough of a threat to the safety of others that he should generally not be allowed to possess a firearm." *Id.* at 26-27. This threat is evidenced, the Government says, by the high recidivism rates among domestic violence abusers, *id.* at 17 (citing *United States v. Skoien*, 614 F.3d 638, 644 (7th Cir. 2010) (en banc), and collecting statistics), and the risk to other family members, bystanders, police officers, and the public. *Id.* at 27-28 (collecting academic sources reporting data on the risks associated with domestic violence).

On the second point, the Government concedes the indefinite prohibition on firearm possession in § 922(g)(9) diverges from the temporary disarmament of its historical forebears but nonetheless maintains the statute's constitutionality on two grounds: "[f]irst, *Rahimi* did not suggest that indefinite disarmament was impermissible" and, to the contrary, supported *Heller*'s statement that the usually permanent prohibitions on possession of firearms by felons are "presumptively lawful." *Id.* at 28 (quoting *Rahimi*, 602 U.S. at 682 (in turn quoting *Heller*, 554 U.S. at 626)). Second, the Government submits, *Rahimi* does not require § 922(g)(9) to be identical to historic regulations, but merely "'analogous enough' to [its] historical precursors 'to pass constitutional muster.'" *Id.* (quoting *Rahimi*, 602 U.S. at 682).

For these reasons, the Government concludes § 922(g)(9) is constitutional as applied to Mr. Renaud and the Court should accordingly deny his motion to dismiss.

### 3.    Ian Renaud's Reply

Mr. Renaud replies that the Government has failed to meet its burden of establishing a "relevantly similar" historical analogue, contending that "it is not enough for the Government to proffer an important interest that the law it advances seeks to promote" because *Bruen* requires a showing of historical tradition of an accepted and enduring restriction on the right to bear arms that is "relevantly similar" to a law or regulation at the time of the Founding. *Def.'s Reply* at 1-2 (citing *Bruen*, 597 U.S. at 30, 68; *Rahimi*, 602 U.S. at 692).

Mr. Renaud submits the Government's "generalized historical examples" focus on individuals deemed to be dangerous by reason of threat of rebellion or insurrection, including colonial restrictions on those disloyal to the British government and Reconstruction-era restrictions on Black citizens. *Id.* at 3 (citing *Gov't's Opp'n* at 18, 22). Another example cited by the Government, Mr. Renaud points out, of "the enshrinement of the rights of Protestants to keep and bear arms in the English Bill of Rights," was "a reaction to perceived abuse of disarmament by English officials as a tool of political repression in the preceding era," evidencing the movement at the time of the Founding to constrain the government's power to disarm. *Id.* at 3-4 (citing *Rahimi*, 602 U.S. at 694, 754). Mr. Renaud recites Justice Thomas's dissent in *Rahimi*, which stated "laws targeting 'dangerous' persons led to the Second Amendment. It would be passing strange to permit the Government to resurrect those selfsame 'dangerous' person laws to chip away at that Amendment's

guarantee." *Id.* at 4 (quoting *Rahimi*, 502 U.S. at 754 (Thomas, J., dissenting) (citation corrected)).

Furthermore, Mr. Renaud contests the Government's use of rejected constitutional language and antebellum commentaries to interpret the Second Amendment. *Id.* at 4-5 (citing *Gov't's Opp'n* at 18-23). He points out that proposed constitutional language was considered and rejected in favor of "more broad and inclusive language," and cites caselaw discouraging the use of non-adopted legislative language as the basis for statutory interpretation. *Id.* at 5 (citing *Daniels*, 77 F.4th 337, 352 (5th Cir. 2023) (in turn citing *Skoien*, 614 F.3d at 648); *Heller*, 554 U.S. at 590; *Minor*, 2024 U.S. Dist. LEXIS 40665, at *10 n.7 (citation amended)). Similarly, Mr. Renaud contends post-Founding scholarship amounts to secondary sources that do not evidence a historical tradition and is thus irrelevant. *Id.* In the alternative, if the Court considers these sources relevant, Mr. Renaud argues the restrictions on firearm possession to only "responsible" or "peaceable" citizens is inconsistent with the holding of *Rahimi* that an individual cannot be disarmed for being found to be not "responsible." *Id.* (citing *Rahimi*, 602 U.S. at 701-02).

Mr. Renaud further argues the Government's historical analogues of surety and "going armed" laws did not pose a burden analogous to § 922(g)(9). Directing this Court to the Supreme Court's discussion of such laws in *Rahimi*, he explains "surety laws were invoked to prevent all forms of violence, including interpersonal violence and also targeted misuse of firearms . . .. [and] 'going armed' laws prohibited 'riding

or going armed, with dangerous or unusual weapons to terrify the good people of the land.'" *Id.* at 6 (quoting *Rahimi*, 602 U.S. at 695).

Mr. Renaud concedes "[l]ike § 922(g)(9), the historical justification for such laws w[as] to prevent interpersonal violence following a determination that the individual posed a credible threat to the safety of another," but emphasizes that while surety laws "permitted temporary disarmament following an individualized determination by a magistrate, bonds could be required for no longer than six months at a time" and "an individual could obtain an exception where a firearm was needed for self-defense or another legitimate reason." *Id.* (citing *Rahimi*, 602 U.S. at 695). Mr. Renaud distinguishes these penalties from § 922(g)(9)'s "lifetime ban of possession of any firearm for any purpose." *Id.* He similarly juxtaposes "going armed" laws, insisting that such laws merely "permitted forfeiture of arms and temporary disarmament during a period of incarceration," a far cry from § 922(g)(9) which makes it a felony offense for him to acquire or constructively possess any firearm indefinitely. *Id.*

Finally, Mr. Renaud argues the Government has failed to establish that its prosecution is constitutional as applied to him by contesting the Government's assertions that he remains "an active threat to the physical safety of others." *Id.* at 7 (quoting *Gov't's Opp'n* at 26). He rejects as unsupported the Government's claim that a five-year-old misdemeanor conviction conclusively demonstrates the misdemeanant poses a continuing threat and points out the Government makes no attempt to define its use of the term "recent." *Id.* Further, Mr. Renaud argues the

Government has not defined the category it describes as a threat to "breach the peace," *id.* (quoting *Gov't's Opp'n* at 26), and that the Supreme Court held in *Rahimi* that Second Amendment rights "cannot be infringed based on vague, ill-defined categories that lack legal grounding." *Id.* (citing *Rahimi*, 602 U.S. at 701-702).

Mr. Renaud states that while disarmament "during his period of incarceration, term of supervision, or while subject to a restraining order" may have been consistent with the Second Amendment, he has now completed his criminal justice sentence and there is no basis nor judicial determination that he continues to pose a credible threat of violence to another. *Id.* Thus, he concludes, the Court should grant his motion to dismiss the indictment. *Id.*

### B.     Legal Standard on Motion to Dismiss Criminal Complaint

Federal Rule of Criminal Procedure 12(b)(1) provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." FED. R. CRIM. P. 12(b)(1). One such motion, relevant here, is a motion to dismiss. "An indictment, or a portion thereof, may be dismissed if it is otherwise defective or subject to a defense that may be decided solely on issues of law." *United States v. Pringle*, No. 22-10157-FDS, 2023 U.S. Dist. LEXIS 193924, at *2 (D. Mass. Oct. 30, 2023). For example, "[a] defendant may seek the dismissal of an indictment on the grounds that the statute authorizing the charges is unconstitutional." *United States v. Fulcar*, No. 23-cr-10053-DJC, 2023 U.S. Dist. LEXIS 192908, at *1 (D. Mass. Oct. 27, 2023) (citing *United States v. Carter*, 752 F.3d 8, 12 (1st Cir. 2014)).

A challenge to the constitutionality of a statute may be facial or as-applied.  To succeed on a facial challenge, the moving party must demonstrate "that the statute lacks any 'plainly legitimate sweep.'"  *Hightower v. City of Bos.*, 693 F.3d 61, 77-78 (1st Cir. 2012) (quoting *United States v. Stevens*, 559 U.S. 460, 472 (2010)).  To succeed on an as-applied challenge, the defendant must show that the statute is unconstitutional as applied to the circumstances of his case. *See id.* at 71-72.

The First Circuit has held that, on either a facial or as-applied challenge, "dismissing an indictment is an extraordinary step," *United States v. Li,* 206 F.3d 56, 62 (1st Cir. 2000) (quoting *United States v. Stokes,* 124 F.3d 39, 44 (1st Cir. 1997)), because, by returning an indictment, a grand jury is carrying out a constitutionally sanctioned function.  *See* U.S. CONST. amend. V ("No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . ..").  "When a federal court uses its supervisory power to dismiss an indictment, it directly encroaches upon the fundamental role of the grand jury.  That power is appropriately reserved, therefore, for extremely limited circumstances." *Whitehouse,* 53 F.3d at 1360 (citing *Bank of Nova Scotia v. United States,* 487 U.S. 250, 263 (1988)).

## C.    DISCUSSION

Mr. Renaud moves the Court to dismiss his indictment on the ground that 18 U.S.C. § 922(g)(9) is unconstitutional as applied to him because it violates his Second Amendment right to bear arms.  The basis of his challenge is that permanent disarmament based on a misdemeanor conviction of domestic violence is

constitutionally impermissible, at least in his case, because it impedes upon his right to bear arms without evidence of a present threat to another, a restriction allegedly uncontemplated by the Founders. Based on both relevant First Circuit precedent and this Court's application of the *Bruen* test to his case, the Court concludes Mr. Renaud's argument is unavailing.

### 1.    Relevant Precedent

Mr. Renaud submits *Bruen* "explicitly rejected the use of 'means-end scrutiny' previously employed by lower courts" and thus argues his case exclusively under the two-step test contemplated by *Bruen* without reference to prior First Circuit or District of Maine caselaw. *Def.'s Mot.* at 3. As an initial matter, Mr. Renaud's position is inconsistent with First Circuit law. "Until a court of appeals revokes a binding precedent, a district court within the circuit is hard put to ignore that precedent unless it has unmistakably been cast into disrepute by supervening authority." *Eulitt v. Me. Dep't of Educ.*, 386 F.3d 344, 349 (1st Cir. 2004), *abrogated on other grounds by Carson v. Makin*, 596 U.S. 767 (2022). The Court thus considers caselaw from the First Circuit and District of Maine regarding the constitutionality of § 922(g)(9) and examines whether it has been explicitly revoked or unmistakenly undermined by the Supreme Court's decisions in *Bruen* and *Rahimi*.

The First Circuit heard a constitutional challenge to § 922(g)(9) in *United States v. Booker*, 644 F.3d 12, and upheld that statute's constitutionality under the formerly applied "means-end scrutiny" test. *Id.* at 22-26. In its analysis, the First Circuit determined "Section 922(g)(9) is, historically and practically, a corollary

outgrowth of the federal felon disqualification statute. Moreover, in covering only those with a record of violent crime, § 922(g)(9) is arguably more consistent with the historical regulation of firearms than § 922(g)(1), which extends to violent and nonviolent offenders alike." *Id.* at 24-25. The First Circuit continued to explain that "actual 'longstanding' precedent in America and pre-Founding England suggests that a firearms disability can be consistent with the Second Amendment to the extent that . . . its basis credibly indicates a present danger that one will misuse arms against others and the disability redresses that danger." *Id.* at 25 (quoting C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 HARV. J. L. & PUB. POL'Y 695, 698 (2009)). The First Circuit thus upheld the constitutionality of § 922(g)(9) as "limited to violent crimes." *Id.* (quoting *Skoien*, 614 F.3d at 641). The Supreme Court subsequently denied Mr. Booker's petition for certiorari on the question. *Booker v. United States*, 565 U.S. 1204 (2012). Notably, the Supreme Court did confront the legality of § 922(g)(9) after *Booker* in *Voisine v. United States*, 579 U.S. 686 (2016), and the majority upheld the statute without implicating its constitutionality. *Compare id.* at 688-99, *with id.* at 713-16 (Thomas, J., dissenting) ("Today the majority expands § 922(g)(9)'s sweep into patently unconstitutional territory").

Absent the First Circuit overruling *Booker*, the Court must follow that decision "unless it has unmistakably been cast into disrepute by supervening authority." *Eulitt v. Me. Dep't of Educ.*, 386 F.3d at 349. Mr. Renaud suggests *Bruen* has such an effect because it "explicitly rejected the use of 'means-end scrutiny' previously employed by lower courts." *Def.'s Mot.* at 3. While Mr. Renaud correctly describes

the new two-step analysis created by *Bruen*, he fails to offer any argument as to how *Bruen* undermines the holdings of *Booker*, nor does he point the Court to any First Circuit case that explicitly revokes the binding precedent in *Booker*.

By the Court's reckoning, the First Circuit's conclusions in *Booker*, which it based on "the historical regulation of firearms," are consistent with *Bruen* and *Rahimi*. In *Bruen*, the Supreme Court reviewed a law from the state of New York that restricted public carry licenses to applicants who can prove "proper cause exists." *Bruen*, 597 U.S. at 12. After parsing, in granular detail, the historical tradition of firearm regulation in this country, the *Bruen* Court concluded that "respondents ha[d] not met their burden to identify an American tradition justifying the State's proper-cause requirement" and held New York's law unconstitutional under the Second Amendment, as applied to the States through the Fourteenth Amendment. *Id.* at 70-71. Several years later, in *Rahimi*, the Supreme Court applied its historical tradition test to § 922(g)(8), a statute which "prohibits an individual subject to a domestic violence restraining order from possessing a firearm if that order includes a finding that he 'represents a credible threat to the physical safety of [an] intimate partner,' or a child of the partner or individual." *Rahimi*, 602 U.S. at 684 (quoting 18 U. S. C. § 922(g)(8)). After examining the historical tradition of firearm restrictions, the *Rahimi* Court stated: "we conclude only this: An individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." *Id.* at 702. In the same paragraph, the

*Rahimi* Court specifically limited its decision to § 922(g)(8) and disclaimed that its decision contemplated "the full scope of the Second Amendment." *Id.*

On the Court's read, neither *Bruen* nor *Rahimi* "unmistakably . . . cast[s] into disrepute" the First Circuit's holding in *Booker* upholding the constitutionality of § 922(g)(9) based on "'longstanding' precedent in America and pre-Founding England" permitting restriction of firearm possession where "its basis credibly indicates a present danger that one will misuse arms against others." *Eulitt*, 386 F.3d at 349; *Booker*, 565 U.S. at 25. As Mr. Renaud has presented no evidence to the contrary, and the Court is independently aware of none, *Booker* remains controlling law within the First Circuit and on this Court. *Cf. United States v. Fulcar*, 2023 U.S. Dist. LEXIS 192908, at *15 (rejecting a post-*Bruen* challenge to the constitutionality of 18 U.S.C. § 922(g)(1) because "controlling First Circuit precedent forecloses [the defendant's] as-applied challenge," noting that *Bruen* considered a different statute than the statute at issue, which had been squarely considered by the First Circuit, that it did not overrule the prior assurances from *Heller* and *McDonald* that the Second Amendment is a qualified right, and that other district courts within the First Circuit had concluded the First Circuit's decision remained controlling precedent after *Bruen*) (citing *Torres-Rosario*, 658 F.3d at 113).

Following the directive of the First Circuit in *Booker*, the Court thus concludes Mr. Renaud's motion to dismiss the indictment based on the unconstitutionality of § 922(g)(9) should be denied based on the precedent of this District and could end its analysis here. However, because prior post-*Bruen* decisions

from this District have applied the *Bruen* framework without reference to *Booker*, *see*

*Minor*, 2024 U.S. Dist. LEXIS 40665, and because it does not change the outcome

here, the Court proceeds to consider the constitutionality of § 922(g)(9) under the

framework articulated by the Supreme Court in *Bruen*.

### 2.    18 U.S.C. § 922(g)(9) As-Applied to Mr. Renaud

#### a.    The *Bruen* Test for Second Amendment Challenges

As noted, the *Bruen* Court overruled the formerly applied "means-end-

scrutiny" framework and implemented a different two-step test to resolve Second

Amendment questions. *Bruen*, 597 U.S. at 24.  Following *Bruen*, courts must consider

whether "the Second Amendment's plain text covers an individual's conduct."  *Id.*;

*accord Gailes*, 118 F.4th at 825.  If the answer to this first question is yes, the *Bruen*

Court deemed the conduct presumptively constitutional and placed the burden on the

government to "justify its regulation by demonstrating that it is consistent with the

Nation's historical tradition of firearm regulation."  *Bruen*, 597 U.S. at 24; *accord*

*Gailes*, 118 F.4th at 825.  To be constitutional, the challenged law need not be "a dead

ringer for historical precursors" or have "a historical twin," *Bruen*, 597 U.S. at 30;

rather, courts "must train [their] attention on two comparisons: 'how and why the

regulations burden a law-abiding citizen's right to armed self-defense.'"  *Ocean State*

*Tactical, LLC v. Rhode Island*, 95 F.4th 38, 44 (1st Cir. 2024) (quoting *Bruen*, 597

U.S. at 29).  As explained by the First Circuit, "we consider the 'how,' comparing the

'burden on the right of armed self-defense' imposed by the new regulation to the

burden imposed by historical regulations" and "the 'why,' comparing the justification

for the modern regulation to the justification for historical regulations." *Id.* at 44-45 (quoting *Bruen*, 597 U.S. at 29).

In this case, the Government "concedes that the plain text of the Second Amendment covers Renaud's conduct (i.e. possession of firearms)." *Gov't's Opp'n* at 8 n.7. The Court thus proceeds to the second step of the *Bruen* test and compares the historical tradition of firearm regulation in this country to the "why" and "how" of § 922(g)(9) as applied to Mr. Renaud.

Notably, however, the Court's analysis of the historic tradition of firearm regulation does not start from square one. The Supreme Court applied the *Bruen* test to restrictions on firearms based on criminal history in *Rahimi*, relying on surety laws and "going armed" laws, the two types of historic disarmament regimes cited by the Government here, to conclude that "[t]aken together, the surety and going armed laws confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Rahimi*, 602 U.S. at 698. The Court thus views the question before it in this case as narrow: whether the Government has demonstrated § 922(g)(9) similarly disarms individuals who "pose a clear threat of physical violence to another." *Id.*

        **b.**    **The "Why" – Threat to Another's Safety Posed by Mr. Renaud**

*Bruen* described the relevant "why" inquiry as determining whether a modern law's burden on a constitutional right is "comparably justified" as historical carveouts to that right. *Bruen*, 597 U.S. at 29. As explained, the Supreme Court has recognized

Congress's right to restrict access to firearms for those who "pose a clear threat of physical violence to another," and the Court's analysis begins from this starting point.

Under plain statutory language, § 922(g)(9) criminalizes firearm possession for any person "who has been convicted in any court of a misdemeanor crime of domestic violence" if the relevant misdemeanor conviction, among other things, "has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon," against a person with whom the defendant has a domestic relationship. 18 U.S.C. §§ 921(a)(33), 922(g)(9). Mr. Renaud seeks to distinguish § 922(g)(9) from § 922(g)(8), the constitutionality of which was upheld in *Rahimi*, on the basis that § 922(g)(8) requires the disarmed person be subject to a court order "a finding that such person represents a credible threat to the physical safety of such intimate partner or child" or "explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury." 18 U.S.C. § 922(g)(8). Mr. Renaud maintains that § 922(g)(9) requires no such finding and thus "strips individuals of their Second Amendment rights even if any credible threat of physical violence has long since passed." *Def.'s Mot.* at 7.

This Court disagrees. A misdemeanor domestic violence conviction, subject to the additional statutory protections of legal representation and right to trial by jury, constitutes unequivocally credible evidence of a threat posed by the misdemeanant to the safety of another. Beginning with the legislative history of § 922(g)(9), contemporaneous statements by the statute's enactors reflect their desire to stem the

34

tide of domestic violence incidents involving firearms.  *See Lautenberg Statement* (explaining "Congress recognized a problem of significant national concern in the combination of domestic violence and guns, and saw the existing law as insufficiently protective of its victims" by only disarming felons, and sought to "close this dangerous loophole" through § 922(g)(9)).  On this Court's reading of the contemporaneous legislative history, Congress thus deemed a conviction for using or attempting to use physical force, or the threatened use of a deadly weapon, indicated a clear and apparent risk to the safety others.

The reason for this legislative conclusion is self-evident based on robust and troubling statistics showing the combination of domestic violence offenders and access to firearms results in escalating violence.  *See, e.g.*, Kivisto et al., *Firearm Use Increases Risk of Multiple Victims in Domestic Homicides*, at 26 (presence of a firearm in a household with a domestic abuser increases the risk of homicide by five times); Braga et al., *Firearm Instrumentality: Do Guns Make Violent Situations More Lethal?*, at 5 (domestic violence assaults with firearms are twelve times more likely to cause death than assaults without guns).  Such effects are felt not only by the household but broader society.  *See, e.g.*, Sharon G. Smith et al., *Intimate Partner Homicide and Corollary Victims in 16 States: National Violent Death Reporting System, 2003–2009*, 104 AM. J. PUB. HEALTH 461, 463-64 (Mar. 2014) (in approximately 25% of domestic violence cases where the abuser killed an intimate partner, the abuser also killed someone else); Nick Bruel & Mike Keith, *Deadly Calls and Fatal Encounters: Analysis of U.S. law enforcement line of duty deaths when*

*officers responded to dispatched calls for service and conducted enforcement, 2010-2014*, at 15 (2016) (finding more officer deaths occurred in responding to domestic disputes that any other type of call).

What is more, the particularly high recidivism rates for domestic abusers evidence an ongoing and present threat. Based on interviews with victims, the re-offense rate has been calculated as between 40% and 80%. Carla Smith Stover, *Domestic Violence Research*, 20 J. INTERPERSONAL VIOLENCE 448, 450 (2005). Many courts, including the Supreme Court, have recognized this high recidivism rate as evidence of present danger. *See, e.g.*, *United States v. Castleman*, 572 U.S. 157, 160 (2014) ("Domestic violence often escalates in severity over time . . . and the presence of a firearm increases the likelihood that it will escalate to homicide") (internal citations omitted); *Gailes*, 118 F.4th at 829 (holding "someone who posed a risk in the past does not mean they no longer do so. Scholars agree that . . . the recidivism rate for domestic-violence offenders is high); *Skoien*, 614 F.3d at 644 (noting "the recidivism rate is high, implying that there are substantial benefits in keeping the most deadly weapons out of the hands of domestic abusers" and concluding "[n]o matter how you slice these numbers, people convicted of domestic violence remain dangerous to their spouses and partners").

Mr. Renaud apparently takes the position that modern justifications for § 922(g)(9) fail because, at the time of the Founding, domestic violence was not considered a serious crime that posed a threat to the safety of others. However, this argument ignores Justice Roberts's robust analysis in *Rahimi*, which described

Founding-era regulatory regimes for punishing those accused of spousal abuse. *See Rahimi*. 602 U.S. at 693-98. For example, surety laws, which were incorporated from England into early American law, "authorized magistrates to require individuals suspected of future misbehavior to post a bond. If an individual failed to post a bond, he would be jailed." *Id.*, 602 U.S. at 695 (citing, e.g., 4 Blackstone 251). Surety laws "could be invoked to prevent all forms of violence, including spousal abuse" and "also targeted the misuse of firearms." *Id.* at 695-96 (citing, e.g., 4 Blackstone 253-54). "As Blackstone explained, '[w]ives [could] demand [sureties] against their husbands; or husbands, if necessary, against their wives.' These often took the form of a surety of the peace, meaning that the defendant pledged to 'keep the peace.'" *Id.* at 695 (quoting 4 Blackstone 252-54).

In *Rahimi*, Justice Roberts specifically relays an infamous 1790 case in Connecticut brought by a wife against her husband, himself a judge, in which the court "ultimately ordered the man to post a bond of £1,000." *Id.* at 696 (citing K. Ryan, "The Spirit of Contradiction": Wife Abuse in New England, 1780-1820, 13 Early American Studies 586, 602-03 (2015)). Thus, at the time of the Founding, spousal abuse was recognized as a crime that warranted intervention and, if necessary to preserve the peace, deprivation of liberty. *See also Kanter v. Barr*, 919 F.3d 437, 453, 464 (7th Cir. 2019), *abrogated by Bruen*, 597 U.S. 1 (Barrett J., dissenting) ("History does not support the proposition that felons lose their Second Amendment rights solely because of their status as felons[, b]ut it does support the proposition that the

37

state can take the right to bear arms away from a category of people that it deems dangerous," including, "for example, those convicted of crimes of domestic violence").

For the reasons described in caselaw both from the Supreme Court and the First Circuit, Congress reasonably identified a continuing threat of physical violence based on a conviction for misdemeanor domestic violence and enacted § 922(g)(9) to restrict access to firearms on that basis. *See, e.g.*, *Booker*, 644 F. 3d at 16. While § 922(g)(9) is admittedly distinguishable from regulatory regimes in place at the Founding for perceived threats to the safety of others, as described in detail by the Supreme Court in *Bruen*, 597 U.S. at 40-70, and *Rahimi*, 602 U.S. at 693-700, Supreme Court jurisprudence is nevertheless clear that, to be constitutional, a modern statute need not be "a dead ringer for historical precursors" or have "a historical twin." *Bruen*, 597 U.S. at 30. Rather, the modern law must be only "relevantly similar." *Id.* at 29.

Especially relevant here is the Supreme Court's admonition that "the Second Amendment is not . . . a law trapped in amber," and that "[i]t permits more than just those regulations identical to ones that could be found in 1791." *Rahimi*, 602 U.S. at 741 (internal quotation marks omitted). In *Rahimi*, the Supreme Court clarified that the modern conception of what is needed to protect domestic partners, especially women, from domestic violence through use of firearms need not be entirely abrogated by an eighteenth-century view of society and the rights of women. *See id.* at 706 ("History has a role to play in Second Amendment analysis, but a rigid adherence to history, (particularly history predating the inclusion of women and

38

people of color as full members of the polity), impoverishes constitutional interpretation and hamstrings our democracy"). The question is thus not strictly what legal regimes were in place at the time of the Founding, but, rather, if the challenged regulation "is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Id.* (quoting *Bruen*, 597 U.S. at 29 & n.7).

In the Court's view, the Government has satisfied its burden here by demonstrating that, § 922(g)(9) addresses threats to the safety of others, specifically domestic partners, in line with the historical tradition of firearm regulation. *See Rahimi*, 602 U.S. at 698 ("[the challenged law's] prohibition on the possession of firearms by those found by a court to present a threat to others fits neatly within the tradition the surety and going armed laws represent"); *accord Minor*, 2024 U.S. Dist. LEXIS 40665, at *9-10 ("the Government has met its burden to show that our Nation has a historical tradition of restricting persons considered to be untrustworthy or dangerous, including persons convicted of violent offenses, such as an assault, from possessing firearms").

Finally, because Mr. Renaud brings an as-applied challenge, the Court examines whether the factual evidence in the record demonstrates the restriction on his individual right to bear arms comports with historic tradition. Several aspects of the Defendant's case demonstrate why he presents a threat to the safety of others, such that his disarmament is "comparably justified." *Bruen*, 597 U.S. at 29. First, while Mr. Renaud asserts he poses no credible threat because his misdemeanor

conviction was from 2019, this argument belies the extent of his relevant criminal record. True, his most recent misdemeanor conviction was from 2019, but this was neither his first domestic offense nor his last. Mr. Renaud previously pleaded guilty in 2014 to domestic violence criminal threatening and criminal restraint, *Gov't Ex. 3*; *Gov't Ex. 4*. Approximately five years later—which, notably, is approximately the same duration as the time between completion of probation on the 2019 misdemeanor and the current charge—he committed the assault giving rise to the 2019 offense. Furthermore, only six months after pleading guilty to the 2019 misdemeanor offense, Mr. Renaud violated the protective order from his 2014 domestic offense and was sentenced to imprisonment in June 2020. *Gov't Ex. 5*; *Gov't Ex. 4* at 1. Multiple convictions for domestic offenses, as well as violations of protective court orders, leads the Court to conclude the Government has demonstrated the credible threat to the safety of another posed by Mr. Renaud. As explained, this restriction on his right to bear arms aligns with the domestic tradition of firearm regulation, and thus does not contravene the Second Amendment.

Moreover, the facts underlying Mr. Renaud's history of domestic violence confirm that he has a record of threatened and actual domestic violence, going back over twenty years and continuing recently. In 2003, Mr. Renaud threatened his ex-girlfriend after a restraining order had been imposed against him, saying that he was coming to her city and would "gut" her and another person "like a fish." *Gov't Ex.* 6.

On May 11, 2014, according to the police report, during an argument with his girlfriend, Mr. Renaud held a "billy club with spikes" over her head and then struck

40

it on the top of a dresser, embedding it in the wood. *Gov't Ex.* 3 at 6. His girlfriend reported to the police that she thought he was going to kill her during the incident and that he further threatened violence against any police officers who should respond. *Id.* According to Mr. Renaud's criminal record, he was found guilty of domestic violence terrorizing on July 1, 2014 but his sentence was deferred for three years and the charge was dismissed on July 5, 2017 upon his successful completion of the deferred disposition. *Gov't Ex.* 4 at 2.

On August 24, 2018, according to the police report, Mr. Renaud and his wife were arguing when Mr. Renaud shoved her with both hands several times, pushing his wife backward into a kitchen counter and yelling in her face. *Gov't's Ex.* 1 at 12, 15. The police found that Mr. Renaud had three long rifles, multiple crossbows, and many large hunting knives at his home. *Id.* at 3-11. On August 29, 2018, Mr. Renaud was charged with domestic violence assault, *Gov't Ex.* 2 at 6, and a criminal complaint was filed against him on September 12, 2018. *Id.* at 1, 6. Mr. Renaud entered a guilty plea to domestic violence assault on May 20, 2019, *id.* at 9, and was sentenced to 364 days in county jail and two years of probation. *Id.*

The docket entries in Mr. Renaud's 2019 domestic violence assault conviction reflect that he admitted violating the terms of his probation on July 9, 2019 and he was sentenced on the revocation on July 12, 2019, that he admitted a second violation on January 7, 2020 and he was sentenced on January 7, 2020 to three months of incarceration with continued probation. *Id.* at 10-15. The docket does not reveal the nature of the conduct that resulted in these revocations.

In addition, Mr. Renaud's criminal history confirms that on November 3, 2019, he was charged with violating a protective order and was found guilty on June 29, 2020. *Gov't's Ex.* 4 at 1. He was sentenced to 100 days on June 29, 2020. *Id.* The events that have given rise to the indictment now pending in Mr. Renaud's indictment allegedly took place on October 15, 2024. *Indictment* at 1.

Finally, the alleged facts underlying the pending indictment further evidence the nature of the threat posed by Mr. Renaud. The affidavit in support of a criminal complaint of Christopher Concannon, Special Agent with the Bureau of Alcohol, Tobacco, and Firearms (ATF), as attached to the criminal complaint, reflects Mr. Renaud was found in possession of fourteen firearms. *Crim. Compl.*, Attach. 1, *Aff. in Support of a Crim. Compl.* (*Concannon Aff.*). Eleven firearms were found in the bedroom where Mr. Renaud and his wife slept. *Id.* at 1-2. Mr. Renaud had three AK-style assault rifles, two on the living room floor, *id.* at 3, 4 & n.2, and six pistols or revolvers. *Id.* Only one firearm, a Savage Arms hunting rifle, was in a safe. *Id.* at 3. This ubiquitous presence of so many readily accessible firearms, some especially lethal, the Court concludes, is precisely the basis for § 922(g)(9)'s restriction.[2]

At bottom, a detailed review of Mr. Renaud's criminal history compels the Court to find that, as of October 15, 2024, he "pose[d] a clear threat of physical violence to another," based on his criminal history of domestic violence, his actions leading to his criminal history, his record of violations of protective orders, his

---

[2]    There is no evidence in this record of his domestic partner's attitude about Mr. Renaud's possession of so many firearms. However, she must have been aware of them because they were in their bedroom and living room.

documented probation revocations, and the danger, which is well recognized, that when people who engage in domestic violence have access to firearms, there is a substantial risk they will use them to perpetrate violence.

Concluding the Government has established a constitutional basis for restricting Mr. Renaud's Second Amendment rights—the "why"—the Court turns to consider the extent of the restriction.

### c.    The "How" – Restrictive Burden on Mr. Renaud

*Bruen* instructs courts to consider "whether modern and historical regulations impose a comparable burden on the right of armed self-defense." *Bruen*, 597 U.S. at 29.  While Mr. Renaud concedes temporary disarmament is constitutionally permissible, he objects to "§ 922(g)(9)'s lifetime ban on possession of any firearm for any purpose." *Def.'s Reply* at 6-7.

For several reasons, the prohibition is not so broad as Mr. Renaud describes. First, the statute's tiered structure contemplates escalating penalties for repeat offenders.  A defendant convicted of only one misdemeanor domestic violence offense is only restricted from possessing a firearm for five years from the date of conviction or completion of sentence.  18 U.S.C. § 921(a)(33)(C).  This restriction is indeed extended to life for repeat offenders; however, multiple convictions further validate the determination of a credible threat to the safety of others, as described above, so as to justify the ongoing restriction.  It is true that the five-year limit for first-time offenders does not include those who victimize their spouse or person with whom the misdemeanant shares a child, *id.*; however, such relationships carry with them legal

and practical reasons for continued contact, thereby justifying the ongoing disarmament to protect the victim's safety.

Second, the statute expressly contemplates avenues for a domestic violence misdemeanant to remove the restriction on the right to bear arms. Specifically, a defendant does not qualify under § 922(g)(9) "if the conviction has been expunged or set aside, or is an offense for which the person has been pardoned or has had firearm rights restored." *Id.* As applied to Mr. Renaud, he is subject to indefinite disarmament based on his conviction for domestic violence against a spouse. However, he has presented no evidence to suggest he has sought and been denied any of the available recourses provided by statute.

The Court's conclusion further comports with Supreme Court jurisprudence. In *Rahimi*, the Court reaffirmed its prior statement in *Heller* that restrictions on the right to bear arms for certain groups, using the examples of "felons and the mentally ill," are "presumptively lawful." *Rahimi*, 602 U.S. at 699 (quoting *Heller*, 554 U.S. at 626-27 & n.26). Such restrictions are similarly permanent, but majority decisions by the Supreme Court have not expressed a concern regarding their temporal scope. Instead, the extent of the restriction is considered commensurate to the identified threat that such persons possessing firearms would pose to others. For the reasons described above, including multiple prior domestic violence convictions, a markedly high recidivism rate, and the magnified danger associated with domestic abusers with access to guns, the safety risks posed by a repeat domestic violence misdemeanant possessing a firearm are of similar degree to the risk posed by the

44

classes of person for which the Supreme Court has permitted restriction of the right to bear arms. *See, e.g.*, *Rahimi*, 602 U.S. at 700 ("Our tradition of firearm regulation allows the Government to disarm individuals who present a credible threat to the physical safety of others").

The Court thus concludes the burden on Mr. Renaud's Second Amendment rights comports with the historical tradition of restricting the right to bear arms for those deemed to pose a credible threat to the safety of others. The Court's conclusion is consistent with a district court decision in Maine by then Chief Judge Jon Levy. *See Minor*, 2024 U.S. Dist. LEXIS 40665, at *9-10. In *Minor*, faced with a similar challenge to the constitutionality of § 922(g)(9), Judge Levy concluded that the "Government has met its burden to show that our Nation has a historical tradition of restricting persons considered to be untrustworthy or dangerous, including persons convicted of violent offenses, such as an assault, from possessing firearms—a tradition analogous enough with the 'how' and 'why' of the firearms restriction in § 922(g)(9) for it to pass constitutional muster." *Id.* It is further consistent with the decisions of other district courts which have considered the constitutionality of § 922(g)(9) post-*Bruen*. *See, e.g.*, *Denis*, 2025 U.S. Dist. LEXIS 16289; *Kaiser*, 2024 U.S. Dist. LEXIS 174017; *Navarro*, 2024 U.S. Dist. LEXIS 122174.

### 3.    Summary

At bottom, the Court concludes that applicable First Circuit and District of Maine precedent supports the constitutionality of § 922(g)(9). Further, in the alternative, the Government has satisfied its burden of establishing a historical

tradition of restricting Second Amendment rights based on a credible threat posed to the safety of others, that persons convicted of domestic violence misdemeanors within the meaning of § 922(g)(9) presents comparable justification of such a credible threat (the "why"), and that the burden on Mr. Renaud's rights is comparable to the historical tradition of such regulations (the "how"). *Accord Minor*, 2024 U.S. Dist. LEXIS 40665, at *9-10.

The Court thus denies Mr. Renaud's motion to dismiss the indictment against him based on his assertion that § 922(g)(9) violates the Constitution.

## IV.    CONCLUSION

The Court OVERRULES Ian Renaud's Objection to Attached Exhibits to Government's Response in Opposition to Defendant's Motion to Dismiss (ECF No. 51) and, further, DENIES Ian Renaud's Motion to Dismiss (ECF No. 33).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 30th day of April, 2025